IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2024

## IN RE TAYLA R.

**Appeal from the Chancery Court for Putnam County**
**No. 2023-16-A    Caroline E. Knight, Judge[1]**

---

### No. M2024-00248-COA-R3-PT

---

This appeal concerns the termination of parental rights. Tamara R. ("Mother") is the mother of minor child Tayla R. ("the Child"). Jesse R. ("Legal Father") is the Child's legal father, having married Mother on the day that the Child was born. The Child was removed into state custody based on Mother's drug use while pregnant and environmental concerns in the home. The Tennessee Department of Children's Services ("DCS"), and the Child's foster parents Autumn M. ("Foster Mother") and Drannon M. ("Foster Father") ("Foster Parents," collectively), filed a petition in the Chancery Court for Putnam County ("the Chancery Court") seeking to terminate Mother's and Legal Father's parental rights to the Child. The Chancery Court terminated Mother's and Legal Father's parental rights on several grounds. Aside from a few token visits with the Child, Mother and Legal Father essentially did nothing on their case, declining to cooperate with DCS or even allow DCS inside their residence, an RV camper. Neither Mother nor Legal Father paid any child support whatsoever for the Child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Cindy Morgan, Sparta, Tennessee, for the appellant, Jesse R.[2]

Billy Tollison, McMinnville, Tennessee, for the appellant, Tamara R.[3]

---

[1] Sitting by interchange.
[2] Father's former counsel, Michael R. Stooksbury, submitted Father's appellate brief.
[3] Mother's former counsel, Tia E. Jensen, submitted Mother's appellate brief.

Jonathan Skrmetti, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

M. Anne Austin, Cookeville, Tennessee, for the appellees, Autumn M. and Drannon M.

## OPINION

## Background

In July 2021, Mother gave birth to the Child. Mother married Legal Father on the same day that the Child was born. DNA testing revealed within a 99.9999% probability that another man was the Child's biological father. The biological father surrendered his parental rights. Shortly after the Child's birth, DCS filed a petition in juvenile court alleging that the Child was dependent and neglected owing to Mother's drug use while pregnant and other concerns such as the home environment. The Child entered state custody and was placed with Foster Parents. In January 2022, the juvenile court adjudicated the Child dependent and neglected. The juvenile court based its dependency and neglect finding on, among other things, a finding that Mother tested positive for methamphetamine after giving birth to the Child and admitted that she had used methamphetamine. The juvenile court found further that, under Tenn. Code Ann. § 37-1-102(27), the Child was a victim of severe child abuse perpetrated by Mother. This was not the first finding of severe child abuse against Mother. In 2018, the juvenile court found that Mother perpetrated severe child abuse against one of her other children.

On June 2, 2022, DCS filed a petition in the Circuit Court for Putnam County ("the Circuit Court") seeking to terminate Mother's and Legal Father's parental rights to the Child. In January 2023, the Circuit Court entered an order terminating Legal Father's and Mother's parental rights. In February 2023, Foster Parents filed a petition in the Chancery Court seeking to adopt the Child. In March 2023, Mother moved to set aside the termination order because she had not been served properly. The motion, which DCS did not oppose, was granted. On May 19, 2023, Foster Parents and DCS jointly filed in the Chancery Court an amended petition for adoption, to set aside the presumption of Legal Father's paternity, and to terminate Mother's and Legal Father's parental rights to the Child. The Circuit Court case was transferred to the Chancery Court and consolidated with the case there. In December 2023, the termination petition was heard.

Neither Mother nor Legal Father appeared at the hearing. Before testimony began, Mother's then-attorney told the Chancery Court the following:

> I contacted or attempted to contact my client, [Mother], yesterday by telephone. The message was that the phone number is not accepting phone

calls.  I'm not sure what that means.  I sent a text saying, please call me.  We had scheduled to meet yesterday, before I went out of town, to prepare.  I have not heard from them yesterday or today.  They certainly expressed their intent to be here, so I would ask the Court to consider that maybe there is some valid reason why they're not here.

I will also tell the Court that I somehow left my telephone at home and did not bring it to court, so it's possible they are trying to contact me, but I wouldn't have any way of knowing that.

\*\*\*

Your Honor, I'm sorry.  I would add my last conversation with them -- and I say this in order for the Court to know that they knew about this trial.  My last electronic communications with them was a request for them for copies of discovery, which were sent, I believe, on the 9th or 10th of this month.  Several hundred pages of documents were sent to them, including notice of hearing and everything.  There's no -- I have no reason to believe that they did not receive those materials.

\*\*\*

I did bounce around, Your Honor.  On behalf of my client, I make a formal request that the matter be continued due to their inability to be here.

Legal Father's then-attorney likewise asked for a continuance, stating as follows to the Chancery Court:

And he knew to be here, Judge.  I informed him of that the last time that we spoke.  I'm not sure why he's not here.  I haven't received any messages from my office.  Certainly, he knows how to get in contact with my office, and I haven't had any messages from him stating why he would -- is not here or would be late.  Unfortunately, I'm in the same boat.  I haven't had any contact.

However, obviously, I would have to agree with Mr. Mackie and join on with his, I guess, motion -- I guess, oral motion to give them more time to continue this to allow for us to gain contact with them and see what's going on with it.

The Chancery Court denied a continuance and the hearing proceeded.  First to testify was Tara Usrey ("Usrey"), a DCS family service worker assigned to the Child's case.  Usrey testified that she scheduled visitation twice a month for Mother and Legal Father.

-3-

Out of 30 scheduled visits, Mother and Legal Father attended five. They were late for each one. Usrey reached out to the parents to ensure that they attended their visitations. Even still, Usrey would sometimes bring the Child to the office and wait to no avail. The last visit occurred on May 5, 2022. Usrey had difficulty communicating with Mother and Legal Father. Mother and Legal Father lived in an RV camper. Usrey saw this camper in person but was not allowed to go inside of it. Neither Mother nor Legal Father attended any child and family team meetings. Usrey testified to her efforts to get Mother and Legal Father to complete an alcohol and drug assessment, but they never did. In November 2022, another child was removed from the parents' custody. Usrey stated that Mother and Legal Father never complied with any of the services that she offered. According to Usrey, Mother and Legal Father told her that "they didn't think they needed to work the permanency plan." Mother and Legal Father also refused drug screens.

Usrey then testified to the Child's circumstances and special needs. The Child is in physical therapy for issues related to her feet and ankles. Foster Mother takes the Child to therapy. Usrey testified that the Child is very attached to Foster Mother and refers to her as "Mom." The Child is also close to Foster Father. Foster Parents adopted the Child's three older sisters, and the Child's younger brother lives in Foster Parents' home as well. Asked if it would be in the Child's best interest to remain with Foster Parents, Usrey said yes. Usrey explained: "Because that's the only family that she's known. She's been with them since day one. She calls them mom and dad. She's very attached to them." Continuing her testimony, Usrey stated that neither Mother nor Legal Father provided the Child with any material support like food, clothing, diapers, or other things. Neither Mother nor Legal Father paid any child support whatsoever.

Regarding visitation, Usrey said that Mother "didn't really have a bond with [the Child]." Mother would usually try to get the Child to take a nap on visits. Legal Father was briefly incarcerated during the four-month period before DCS filed its petition, but for less than a day each time. During visits, Legal Father tended to play on his phone. He did not engage much with the Child. As for why he missed certain visits, Legal Father would sometimes say he had car trouble. Usrey told Legal Father that she could provide transportation or reschedule the visit if he reached out to her. When Usrey tried to go over the criteria and procedures for termination of parental rights with Legal Father, he told Usrey that he did not care about that.

Usrey then testified to the permanency plans developed for Mother and Legal Father. The conditions that led to the Child entering state custody were prenatal drug use, housing concerns, parenting concerns, and mental health concerns. The first permanency plan was developed on August 25, 2021. At that point, the goal was "return to parent." Legal Father was required to complete a parenting assessment; he failed to do so. Legal Father was required to sign releases to allow his providers to speak to DCS; he failed to do

-4-

so. Legal Father was required to undergo an alcohol and drug assessment and follow its recommendations; he failed to do so. Legal Father was required to take drug screens; he failed to do so. Legal Father was required to not incur any new criminal charges and, if he did, to notify DCS; he was thereafter arrested and failed to notify Usrey. Legal Father was required to be on time for visits; provide for the Child during visits; and notify his family service worker if he needed transportation. Legal Father was not on time for visits and did not provide for the Child. He would sometimes notify Usrey that he had car trouble, but usually late. Legal Father also was required to obtain and maintain a legal income; provide proof of a legal income; and create a budget. While Legal Father told Usrey that he worked for himself, he never provided any proof of that, nor did he create a budget. Legal Father was required to obtain and maintain appropriate housing; maintain that home for six months; be monitored through home visits; provide proof of rent and utility bills being paid each month; and DCS would conduct background checks on whoever else was living in the home. Legal Father never allowed Usrey into the RV.

Usrey then testified to Mother's responsibilities under the permanency plan. Mother was required to participate in an alcohol and drug assessment and follow its recommendations; she failed to do so. Mother was required to undergo drug screens; she failed to do so. Mother was required to participate in a clinical parenting assessment and sign a release for DCS. Mother never took a clinical parenting assessment despite having had several children but never successfully parenting any of them. Mother also was required to sign releases to allow her providers to communicate with DCS; she failed to do so. Mother was required to notify DCS of any new legal charges. Usrey said that Mother never told her about any new charges, but Usrey did not know for sure about new legal charges either way. Mother was required to obtain and maintain a legal source of income; provide proof; and create a budget. To Usrey's knowledge, Mother did not obtain a legal source of income, nor did she create a budget. Mother also was required to obtain and maintain safe and appropriate housing; maintain it for six months; be monitored through home visits; provide proof of utility bill payments; and DCS would conduct background checks on anyone else living in the home. Mother never let Usrey into the RV. Mother once gave her mother's address to Usrey, but Usrey was not allowed inside that residence either. Mother was required to be on time to visits; notify DCS 24 hours in advance if she could not make a visit; provide for the Child during visits; and notify DCS 48 hours in advance if she needed transportation. Mother was not on time for any visits; failed to notify Usrey 24 hours in advance that she could not make a visit; never brought anything like clothes or formula to visits; and failed to notify Usrey when she needed transportation in sufficient time to arrange it.

Usrey then testified to subsequent permanency plans. A second plan was developed on January 5, 2022, with goals of "return to parent" and "adoption." The new plan kept the previous plan's responsibilities but added a domestic violence education component.

Asked why this was added, Usrey explained: "We added that because of [Legal Father's] behavior. He's appeared very controlling during the times that I was around them, and just his behavior from the hospital whenever we first removed [the Child], his behavior at court a few times, we decided it would be best if they had that." Usrey said that Mother and Legal Father would sometimes argue back and forth during visits, but it never got "out of hand." On June 20, 2022, a third plan was developed. By this stage, the goal was "adoption." Nevertheless, services were still available if Legal Father and Mother wanted to work them. They did not work these services. Usrey was then asked about Legal Father's request that communication with the couple go through him. Usrey said that she assumed this was because Legal Father wanted to be "in control."

On cross-examination, Usrey acknowledged that Mother has a speech impediment that makes her difficult to understand sometimes. Usrey said that Mother never expressed any fear of Legal Father. Usrey could not point to any evidence there was ever any domestic violence between Mother and Legal Father. However, Legal Father once "came at" Usrey screaming and yelling after a visit was canceled when he and Mother showed up an hour late. Mother and Legal Father objected to some if not all the steps of their permanency plan. Usrey acknowledged that there was nothing to show that Legal Father had used illegal substances over the course of the case. Legal Father told Usrey that he worked odd jobs for cash, thus he did not have a regular paystub to show her. Usrey said that, as an alternative, she asked him multiple times for a bank statement. Usrey also asked Legal Father to sit down with her to create a budget, but he was unwilling.

Next to testify was Tabitha Tellez ("Tellez"), a permanency specialist/family service worker for DCS. Tellez began working on the Child's case in late 2022. Asked her opinion of Foster Parents, Tellez said: "I think they're genuine, great people. I didn't have any negative experiences with them or anything." Tellez said that Foster Parents have a "very happy, open home." The Child had bonded with Foster Parents. In July 2023, Tellez took over the duty of family service worker on the Child's case. She carried the case until Usrey came back from maternity leave in November. In August, Tellez got a text from Legal Father stating that he had a new number. After a month, Tellez stopped having contact with Legal Father and Mother as the phone number no longer worked. For the majority of September, Tellez had no contact with Legal Father or Mother. Tellez attempted a home visit, but nobody answered the door of the RV. Tellez later found out that Mother was in jail. Tellez visited Mother in jail and reviewed the permanency plan with her. Mother signed a copy of the criteria and procedures for termination of parental rights. Legal Father was not present. Tellez said that while Mother has a speech impediment, she was still able to communicate with her.

Continuing her testimony, Tellez said that Mother had been jailed for "driving on a suspended license, expired license plate, and criminal impersonation times two. And then

she was then transferred to Putnam County for four warrants of probation violation." As for Legal Father, he was incarcerated for less than 24 hours in November for contempt of court stemming from a January 2023 charge and was jailed again in December. Neither Legal Father nor Mother told Tellez about their incarceration; Tellez had to find out for herself. On cross-examination, Tellez said that she had discussed the permanency plan with Legal Father, although he told her that he did not intend to complete it. Legal Father told Tellez that "he thought once he was able to say his piece in court, everything would work itself out." Tellez left a copy of the criteria for termination at Legal Father's residence. No one answered the door.

Foster Mother testified next. The Child had lived continuously in Foster Parents' home since August 2021. Foster Mother stated that the Child goes to occupational therapy once a week and wears braces on her ankle. The Child undergoes physical therapy as well. Foster Mother said that the braces must be put on the Child daily. The Child wears the braces for a couple of hours, and then they are taken off. Foster Parents adopted the Child's sisters. Foster Parents also had the Child's half-brother in their home. Asked about the Child, Foster Mother said that she is "a ray of sunshine. She is energetic and a hundred miles an hour all the time. But she's very happy. And she laughs all the time. She's just a very happy little two year old." The Child is very close to her sisters. Foster Mother said that it felt like the Child was made for her family and was part of it. Foster Mother wished to adopt the Child. On the other hand, Foster Mother said that the Child has no attachment or positive relationship with Legal Father or Mother. The final witness to testify was Foster Father. His testimony largely echoed that of Foster Mother.

On January 17, 2024, the Chancery Court entered an order terminating Mother's and Legal Father's parental rights to the Child. As for Mother, the Chancery Court found the grounds of severe child abuse and failure to manifest an ability and willingness to assume custody. The Chancery Court found further that termination of Mother's parental rights is in the Child's best interest. Regarding Legal Father, the Chancery Court found that his presumption of paternity to the Child had been successfully rebutted and dismissed him from the case.[4] Alternatively, the Chancery Court terminated Legal Father's parental rights to the Child on the ground of failure to manifest an ability and willingness to assume custody. The Chancery Court found further that termination of Legal Father's parental rights is in the Child's best interest. The Chancery Court found, in significant part:

---

[4] The Chancery Court specifically found that Legal Father was the Child's legal father, while DNA testing proved that another man was the biological father. The Chancery Court stated that "the Court finds that the legislative intent of the statute, and from the caselaw cited by counsel for the Petitioners, places a superior claim to paternity on the biological parent. All of this is sufficient to rebut the presumption of paternity and to dismiss [Legal Father] from this case."

[Severe child abuse]

[Mother] was previously adjudicated on March 8, 2018 in the Juvenile Court of Putnam County, Tennessee, by the Honorable Judge John Hudson, to have committed severe child abuse against a child who is a third party to this action and a sibling to the child at issue in this action. In addition, [Mother] was also adjudicated subsequently, on January 13, 2022, in the same court and by the same judge, to have committed severe child abuse against the child at issue, Tayla. The basis for the severe child abuse by the Respondent mother was the use of methamphetamine during her pregnancy with Tayla, as well as a positive drug screen for methamphetamine, which was administered at the hospital at the time of the child's birth. This is sufficient proof to find by clear and convincing evidence that the ground of severe child abuse has been met.

***

[Failure to manifest an ability and willingness to assume custody]

DCS's history with [Mother and Legal Father] goes back to the child's birth. Witnesses have outlined over two years of efforts by DCS to help these parents meet their requirements and to change their circumstances, but the parents have largely, not only failed to comply, but failed to participate. [Mother and Legal Father] have not attended a majority of the court hearings regarding the child, beginning with the lower court and through this process. They are not present today. There is no proof before the court that the Respondents have a home that is safe and stable. They failed to allow the DCS FSW, Ms. Usrey, to examine their home and were inconsistent in even sharing a current address with her. The Court heard proof that both [Mother and Legal Father] continue to incur criminal charges, as recently as December 4, 2023 with regard to [Legal Father]. Respondents were not present and did not participate in the hearing. There is no proof before the Court today of any ability or willingness by the Respondents to assume physical or legal custody of Tayla.

Likewise, the Court finds based on these facts that placing the child in [Mother's and/or Legal Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. There is case law before the Court today that would support a finding of substantial risk of harm to Tayla if she were returned to these parents. They're strangers to her. She does not know them.

***

[Best interest]

(A) "The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority." Terminating parental rights will have a positive effect and positive impact on Tayla's need for stability and continuity of placement throughout her minority. She has only known the foster family since birth. [Mother and Legal Father] are strangers to her. This factor weighs in favor of termination of parental rights[.]

(B) "The effect a change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and medical condition." A change of caretaker or a change of physical environment is very likely to have a profound negative effect on Tayla's emotional, psychological, and her medical condition. She has no relationship [with Mother and Legal Father]. They have shown no willingness to provide for even her most basic needs. In addition, Tayla has special needs. She requires braces on her ankles, in conjunction with both occupational and physical therapy. Her foster mother is the person who takes her to these appointments and is educated on how to work with Tayla at home by applying the braces and working with her to make sure she continues to improve. It is significant to the Court that [Mother and Legal Father] have never inquired at the few visits they attended about Tayla's health, doctor's appointments, basic or special needs or how those needs were being met. This factor weighs in favor of termination of parental rights[.]

(C) "Whether the parent has demonstrated continuity and stability in meeting the child's basic, material, educational, housing, and safety needs." Respondents, [Mother and Legal Father], have not demonstrated any ability to meet Tayla's basic, material, educational, housing, and safety needs. The Respondents are transient. DCS has had no opportunity to observe the inside of their home, which is a RV. The Court finds that the Respondents attempted to evade inspection by DCS by failing to communicate and failing to share with DCS their current address. Respondents are not present today to present proof regarding any of these factors. This factor weighs in favor of termination of parental rights[.]

(D) "Whether the parent and the child have a secure and health parental attachment, and if not, whether there is a reasonable expectation that the parent can create such an attachment." There is no parental attachment between Tayla, and [Mother and Legal Father]. Respondents are strangers to the child. The Court has no reasonable expectation that the Respondents

-9-

can create such an attachment. Respondents have barely been involved in the court actions. They are not here today. Respondents have had over two years to show some effort in creating a bond and attachment with Tayla and have failed to do so. This factor weighs in favor of termination of parental rights[.]

(E) "Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child." The Court has found in the Circuit Court proceeding, that was consolidated for hearing with this matter, that the few visits with the child attended by [Mother and Legal Father] were mere token visitation. The Respondents did not use these few visits to cultivate a positive relationship with the child. Rather, they encouraged the child to sleep so that they could spend time on their cell phones, which is the opposite of actions geared towards cultivating a positive relationship. This factor weighs in favor of termination of parental rights[.]

(F) "Whether the child is fearful of living in the parent's home." [Mother and Legal Father] are strangers to Tayla. She is bonded with her current placement and foster home, which is the only home she has known. The Court finds that what could she be, but afraid, if thrust in amongst strangers. This factor weighs in favor of termination of parental rights.

(G) "Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms." Petitioners conceded that this factor does not apply and therefore it does not weigh in favor of termination of parental rights.

(H) "Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent." Tara Usrey and Tabitha Tellez's testimony of their observations of the foster home and family environment were overwhelmingly positive. The foster parents were described as "genuine" people. Their home was described as loving, open, and happy. Tara Usrey described Tayla and the foster mother as being very bonded. Tabitha Tellez described how Tayla would go to her foster mother to be held. She described Tayla's closeness to both foster parents. When Ms. Tellez, who was a stranger to Tayla, was in the room, Tayla would stay close to her foster parents. Both witnesses said Tayla demonstrates love and attachment to both foster parents. All of Tayla's physical and emotional needs are being provided for in the foster home. It's her foster parents that she turns to for love and emotional support, as well as care for her special needs. The Court finds that because of the foster parents' involvement with Tayla, she receives services through TEIS [Tennessee Early Intervention Services]. Tayla is described by her foster parents as energetic, a rough houser and a wildcat, but what the Court hears is that she is an active child,

and she is able to be active both inside and outside this home. She loves to rides her bicycle. She's even allowed to ride it inside. They have a pet dog in the foster home, which Tayla loves and plays with. It's impossible for the Court not to see and even feel, which can never be adequately reflected on the record, the demeanor of these two foster parents, the [foster] family. They are genuine, loving folks. [Foster Mother] says of Tayla, she was made for us. They enjoy one-on-one time. Tayla is even beginning to engage lightly in some household chores, where she is a laundry helper, and she's also a helper when it's time to load the dishwasher. She tells her foster parents that she loves them. She calls them Mama and Daddy. She misses her mama when they're apart. [Foster Father] is the cook in the home, and he is described as feeling fulfilled when he knows that Tayla has been taken care of and fed. This factor weighs in favor of termination of parental rights. (I) "Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster sibling, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage." The foster family adopted [the Child's] three older siblings in November 2018. They also serve as foster parents to Tayla's younger, approximately one-year, old brother. Tayla enjoys a relationship with her three older sisters and younger brother. [Foster Mother] described Tayla, in a half joking and lighthearted manner, as jealous of little baby brother, but that they enjoy a good relationship. Tabith Tellez observed all the children outside playing. She described the children as happy. [Foster Mother] testified that Tayla is close to her sisters. If they are home from school, she is constantly interacting with them. They play together. They have a game with dolls that they call "baby family." So, we have a foster family where the mother makes the home and cares for the youngest two, and the father provides and even puts food on the table, which they enjoy every night around the table as a family. These things all demonstrate wonderful and deep connections that this just over two-year-old child already has with this family and her own siblings, as well as their extended family. She has maternal grandparents who are Nonna and Papa. She spends the night with them. While she's there, she engages with animals that they have, and she even gathers eggs. She has a similar relationship with the paternal grandparents, who are Memaw and Pawpaw. She goes shopping with them. They love her and she loves them. They spoil her. This supportive family environment includes and extends to [Foster Mother's] best friend and her family. They engage in group dinners. Family activities for [the foster family] also include community events like parades, just time together attending church and going to the park to play. This Court could not say it any better than [Foster Mother] said in describing Tayla's lack of

relationship with her parents, the Respondents. [Foster Mother] says, we are all she knows. And this Court, based on the proof today, agrees with that and finds there is no parental attachment whatsoever between Tayla and her parents. This factor weighs in favor of termination of parental rights.

(J) "Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances or controlled substances analogues which may render the parent unable to consistently care for the child in a safe and stable manner." There is no proof before the Court of a lasting adjustment of circumstances, and, in fact, the proof before the Court is much to the contrary. The Court doesn't know a great deal about [Legal Father and Mother], except a persistence of circumstances, conduct, and conditions which would make it unsafe and not beneficial for Tayla to be in their home. The Court doesn't have direct proof that there's currently criminal activity in the home, but there is proof before the Court of ongoing criminal charges that both parents are incurring. And despite multiple attempts throughout the history of this case by DCS to obtain urine and other drug screens, both parents have refused. So, they did not take the opportunity to demonstrate to the state or to this Court that they were alcohol free or drug free. This factor weighs in favor of termination of parental rights[.]

(K) "Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct or conditions." Here we have two parents who have just flat-out refused to participate with the department. This factor weighs in favor of termination of parental rights.

(L) "Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department." FSW Usrey engaged in real effort to ensure that these parents had visitation. She called the parents. She sent the parents text messages. These calls and texts included pre-visit communication to attempt to schedule dates that were based on the parents' availability. She took the additional step of sending reminder communication. As the parents continued to fail to participate in visitation, she began to request, on behalf of the department, that they confirm a day prior, so that Tayla, who was an infant in the beginning, would not be brought into a DCS office to wait in vain as things continued to deteriorate with the parents' level of participation. The department requested that they arrive 15 minutes early. Ms. Usrey continued these attempts, even though she had real difficulty with the phone and phone number for the respondent mother, and communication then was

directed by the Respondent father to be through him. Often times, she has stated on the record, his phone was not in service. Also, often times her calls were sent to voicemail. His communication was inconsistent at best. As has already been detailed, the Respondents were consistent in not providing addresses during her limited communications with them. She needed to assess or inspect their home, to ensure the safety of the home to eliminate risk factors to Tayla, to assess their ability to meet this child's basic needs, but also so that the department could identify areas where they might need help. And they refused that. The home was an RV. From the exterior, Ms. Usrey observed that it was in poor condition. She was never allowed to enter the home. There were additional steps that the department took on behalf of the parents, such as setting up appointments for alcohol and drug (A&D) assessments with Health Connect. Ms. Usrey testified that there were multiple providers involved, that there were multiple attempts to schedule this, that the respondents never completed an A&D assessment. A later added requirement for [Legal Father] was domestic violence and anger management classes through Omni. This was based on his behavior that Ms. Usrey observed. He never completed that. Her testimony was that both parents stated to her that they "did not want to work the permanency plan." Both parents were to complete a clinical parenting assessment through Voices for Parents. This would have been to their benefit. It could have identified deficiencies in their parenting and allowed DCS to coordinate services accordingly. It was scheduled multiple times. Neither ever completed this service. With regard to [Legal Father] specifically, he requested a specific class on Saturday. Saturday classes did not exist. A class was scheduled just for him, and he did not participate. So, this Court does find that the department made reasonable efforts to assist each parent in making a lasting adjustment. The parents just didn't meet the department. This factor weighs in favor of termination of parental rights.

(M) "Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing circumstances, conduct or conditions that made an award of custody unsafe and not in the child's best interest." The parents failed to demonstrate any urgency as is evidenced by the Court's previous findings. This factor weighs in favor of termination of parental rights.

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect towards the child or any other child or adult." [Mother] has committed severe child abuse against two of her children and both [Mother and Legal Father] have neglected the children. This factor weighs in favor of termination of parental rights.

(O) "Whether the parent has ever provided safe and stable care for the child or any other child." The proof before the Court today is to the contrary, that there's no proof before the Court that either of these parents have ever provided safe and stable care not only for Tayla but for any child. In fact, all of the children identified in the proof today have been removed and are in the care of [Foster Parents]. This factor weighs in favor of termination of parental rights.

(P) "Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive." These parents have failed, for reasons already placed on the record, to demonstrate any understanding of the basic and specific needs required for the child to thrive. This factor weighs in favor of termination of parental rights.

(Q) "Whether the parent has demonstrated the ability and commitment to creating and maintain a home that meets the child's basic and specific needs and in which the child can thrive." These parents' failure to create and maintain a home that meets the child's basic and specific needs and in which the child can thrive is evidence throughout the record. This factor weighs in favor of termination of parental rights.

(R) "Whether the physical environment of parent's home is healthy or safe for the child." There's no proof of any healthy or safe home environment that [Legal Father and Mother] can provide. This factor weighs in favor of termination of parental rights.

(S) "Whether the parent has consistently provided more than token financial support for the child." Neither parent has ever provided anything more than token support for the child. This factor weighs in favor of termination of parental rights.

(T) "Whether the mental or emotional fitness of the parent would be detrimental to the child and prevent the parent from consistently and effectively providing safe and stable care and supervision of the child." There is case law before the Court today that would support a finding of a substantial risk of harm to Tayla, if she were returned to these parents. They're strangers to her. She does not know them. This factor weighs in favor of termination of parental rights.

On February 12, 2024, an additional termination order was entered, this time under the heading of the Circuit Court.[5] This order found additional grounds for termination

---

[5] The Chancery and Circuit Court actions were consolidated below. The Circuit Court action was transferred to the Chancery Court, with the Circuit Court judge sitting by interchange in Chancery Court. Separate orders were entered in the Chancery and Circuit Court actions. Mother and Legal Father have appealed both orders, and their appeals have been consolidated in this Court. While the Circuit Court judge did not make an explicit reference to her interchange status, we regard the February 2024 order of the

-14-

against both Mother and Legal Father—abandonment by failure to visit, abandonment by failure to support, and substantial noncompliance with the permanency plan—and concluded that termination of parental rights was in the Child's best interest, all by clear and convincing evidence. The additional grounds for termination were found as follows:

**Abandonment by failure to support — [Mother]**

10. The Petition to Terminate Parental Rights was filed on June 2, 2022.

11. [Mother] was not incarcerated in the four months immediately preceding the filing of the petition, or from February 2, 2022, through June 1, 2022.

12. The Juvenile Court of Putnam County ordered [Mother] to pay child support for the child in the amount of $259.00 per month.

13. The law presumes that a parent over the age of 18 years old is aware of her duty to support her child. Furthermore, [Mother] was given and explained the Criteria and Procedure for Termination of Parental Rights on at least two occasions, which explains that the failure to pay support for a child for four months immediately preceding the filing of a petition to terminate parental rights is a ground for termination of parental rights.

14. The Court finds that [Mother] is over 18 years old, she knew her child was in foster care, she knew that she had an obligation to support her child, [Mother] was ordered to pay child support, and, nevertheless, [Mother] failed to pay any support for the child; therefore, her parental rights should be terminated.

**Abandonment by failure to engage in more than token visitation — [Mother]**

15. Ms. Usrey testified that, from February 2, 2022, to June 1, 2022, [Mother] engaged in three visits with the child, although multiple visits were scheduled. Ms. Usrey testified that the mother was late to each visit and that there was a lack of engagement with the child at those visits. [Mother] never provided any food, formula, or clothing for the child. The mother would hold the child to feed the child but there was no other engagement. The visits were so infrequent that the child did not acknowledge [Mother] as her parent. Ms. Usrey testified that it seemed that the goal of [Mother] was to get the child to sleep.

---

Circuit Court as an order of the Chancery Court. *See In re Estate of Nelson*, No. W2006-00030-COA-R3-CV, 2007 WL 851265, at *2 n.4, *7 n.6 (Tenn. Ct. App. Mar. 22, 2007), *no appl. perm. appeal filed* (Despite trial occurring in chancery court, "we treat this judgment as one entered by the general sessions probate court because the chancellor was sitting for the general sessions probate judge by interchange.").

16. The Court finds that [Mother] knew the child was in foster care. She knew how to schedule visits because she scheduled visitation and actually participated in three visits. [Mother] was aware of her duty to visit her child because she was given and explained the Criteria and Procedure for Termination of Parental Rights on two different occasions. [Mother] knew that her failure to engage in visitation or to engage in more than token visitation was a ground for termination of parental rights.

17. [Mother] failed to engage in more than token visitation and failed to provide a justifiable excuse for failing to engage in more than token visitation with the child. Therefore, her parental rights should be terminated.

### Abandonment by an incarcerated parent for failure to support — [Legal Father]

18. [Legal Father] was incarcerated in the four months immediately preceding the filing of the petition to terminate parental rights.

19. The case manager testified that [Legal Father] was incarcerated on February 2, 2022, from 3:51 a.m. to 3:58 p.m. and again on March 5, 2022, from 12:53 a.m. until 5:59 p.m. in Putnam County, Tennessee.

20. The case manager testified that [Legal Father] was not incarcerated from October 1, 2021, through February 1, 2022.

21. [Legal Father] contributed nothing to the support of the child from October 1, 2021, through February 1, 2022. Furthermore, if a subsequent reviewing court finds that this four-month period of time is incorrect, this Court finds that [Legal Father] did not contribute to the support of the child since the child entered custody on August 3, 2021.

22. [Legal Father] is presumed to have knowledge of his duty to support his child by statute because he is a parent over the age of 18. [Legal Father] was given and explained the Criteria and Procedure for Termination of Parental Rights on two occasions.

23. [Legal Father] knew the child was in foster care.

24. [Legal Father] made no attempt to support the child prior to his incarceration and provided no justifiable excuse for failing to support the child prior to his incarceration. Therefore, his parental rights should be terminated.

### Abandonment for failure to engage in more than token visitation — [Legal Father]

25. [Legal Father] visited the child one time from October 1, 2021, through February 1, 2022. The case manager testified that [Legal Father] was 20

minutes late to that visit and that he stayed on his phone for the entirety of the visit. He did not feed or hold the child. He did not change the child's diaper or engage with the child in any meaningful way.

26. [Legal Father] had been explained and given the Criteria and Procedure for Termination of Parental Rights on two different occasions. The Criteria and Procedure for Termination of Parental Rights explained that failing to visit or engage in more than token visitation for four months prior to a parent's incarceration was a ground for termination of parental rights.

27. The Court finds that [Legal Father] was aware of his duty to visit the child prior to his incarceration.

28. [Legal Father] knew the child was in foster care.

29. [Legal Father] knew how to schedule visits because he scheduled and participated in a visit prior to his incarceration.

30. [Legal Father] did not provide any justifiable excuse for his failure to visit more than once in the four months preceding his incarceration.

31. The Court finds that the visit that [Legal Father] participated in prior his incarceration was token visitation. Therefore, [Legal Father's] parental rights should be terminated.

32. If a subsequently reviewing court should determine that the time period of October 1, 2021, through February 2, 2022, is the incorrect 4-month period of time for the measurement for [Legal Father], this Court also finds that [Legal Father] was with [Mother] at all of the visits that she had from February 2, 2022, through June 1, 2022, and his participation in the visitation was token. [Legal Father] did not engage with the child at all. He stayed on his phone the entire visit. He never provided food or clothing for the child.

\*\*\*

## Substantial noncompliance with the permanency plans — [Mother and Legal Father]

34. Permanency plans were developed for this child with the initial plan being developed on August 25, 2021. The goal of the initial plan was return to parent. That permanency plan was entered into evidence as Exhibit Number 20.

35. The statement of responsibilities for [Mother] and [Legal Father] included completing a clinical parenting assessment and following the recommendations, signing releases of information so the Department could communicate with the service providers, openly and honestly completing an alcohol and drug assessment and following the recommendations, submitting to and passing random urine, hair follicle, and/or nail bed drug screens, only

taking prescription medications that are prescribed to [Mother] and [Legal Father], not incurring new criminal charges, be on time to all scheduled visits and provide for the child's needs during the visits, be sober at visits, obtain and maintain a legal means of income, obtain and maintain safe and appropriate housing for at least six months and allow the case manager to conduct home visits.

36. The initial permanency plan was ratified by the Juvenile Court of Putnam County on October 28, 2021. The initial plan was reasonably related to remedy the conditions that necessitated foster care and was in the child's best interests.

37. The Plan was revised on January 5, 2022 with goals of return to parent and adoption. That plan contained substantially the same statement of responsibilities for [Mother] and [Legal Father] and added the requirement to attend domestic violence counseling and was ratified on February 24, 2022.

38. Each permanency plan clearly identified in writing the statement of responsibilities for [Mother] and [Legal Father].

39. All of the requirements in the permanency plans were reasonably related to remedy the conditions that necessitated foster care.

40. Ms. Usrey testified that she scheduled multiple alcohol and drug assessments for the parents, but they never completed the assessment. Ms. Usrey asked for the parents to submit to drug screens before each visit and the parents refused to submit to any drug screens. The parents never participated in a clinical parenting assessment. This was especially important because [Mother] has had several children and has never successfully parented any of them. Despite Ms. Usrey arranging several clinical parenting assessments, the parents did not participate in one. Neither parent signed releases of information so that the Department could communicate with service providers. Neither parent provided proof of a legal means of income nor provided a budget to demonstrate the family's income. Although parents were living in an RV, they never allowed the case manager to look inside of it to verify that it was safe and appropriate for the child. The parents were required to be on time to all of their scheduled visits. The parents visited five times out of the thirty visits that were scheduled, and they were late to each of the five visits. The parents did not provide any clothing, formula, or diapers for the child at the visits. Neither parent completed the domestic violence counseling,

41. The Court finds that the parents are in substantial noncompliance with the statement of responsibilities in the permanency plans and therefore, the parental rights of [Mother] and [Legal Father] should be terminated.

Mother and Legal Father timely appealed to this Court.

## Discussion

We restate Mother's issues on appeal as follows: 1) whether the Chancery Court erred in denying her a continuance; 2) whether the Chancery Court erred in finding the ground of severe child abuse against Mother; 3) whether the Chancery Court erred in finding the ground of abandonment by failure to visit against Mother; 4) whether the Chancery Court erred in finding the ground of abandonment by failure to support against Mother; 5) whether the Chancery Court erred in finding the ground of substantial noncompliance with the permanency plan against Mother; 6) whether the Chancery Court erred in finding the ground of failure to manifest an ability and willingness to assume custody against Mother; and 7) whether the Chancery Court erred in finding that termination of Mother's parental rights is in the Child's best interest. For his part, Legal Father raises the following issues, as restated slightly: 1) whether the Chancery Court erred in finding that Legal Father's presumption to paternity was rebutted; 2) whether the Chancery Court erred in finding the ground of abandonment by failure to visit against Legal Father; 3) whether the Chancery Court erred in finding the ground of abandonment by failure to support against Legal Father; 4) whether the Chancery Court erred in finding the ground of substantial noncompliance with the permanency plan against Father; 5) whether the Chancery Court erred in finding the ground of failure to manifest an ability and willingness to assume custody against Legal Father; and 6) whether the Chancery Court erred in finding that termination of Legal Father's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[6] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and

---

[6] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[7] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[8] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law

---

[7] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[8] Tenn. Code Ann. § 36-1-113(i).

within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The Tennessee Supreme Court has instructed

"that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted).

We first address whether the Chancery Court erred in denying Mother's oral request for a continuance. A trial court's denial of a motion for a continuance is reviewed under an abuse of discretion standard. *In re A'Mari B.*, 358 S.W.3d 204, 213 (Tenn. Ct. App. 2011). In *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

> Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

This Court has discussed the factors to be considered when reviewing the grant or denial of a continuance:

The party seeking a continuance bears the burden of establishing the circumstances that justify the continuance. *Osagie v. Peakload Temp. Servs.*, 91 S.W.3d 326, 329 (Tenn. Ct. App. 2002). Decisions regarding the grant or denial of a continuance are fact-specific and "should be viewed in the context of all the circumstances existing" at the time of the request. *Nagarajan v. Terry*, 151 S.W.3d 166, 172 (Tenn. Ct. App. 2003). The circumstances include: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *Id.* (footnotes omitted).

*In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *5 (Tenn. Ct. App. Feb. 14, 2019), *no appl. perm. appeal filed*.

It was Mother's burden as the party seeking a continuance to establish that the circumstances justified a continuance. Addressing each factor in the analysis, Mother argues that a delay of perhaps a week or two would not have been a hardship when weighed against her parental rights; that Mother may not have had adequate notice of the termination

-24-

hearing; that Mother's attorney at trial was diligent in asking for a continuance; and that the prejudice to Mother was the loss of her parental rights.

First, we disagree with Mother's characterization of the length of time that the case had been pending. By the date of the hearing, seven months had passed since Foster Parents filed their amended petition, and a year and a half had passed since DCS filed its petition. That is not an insubstantial amount of time in the life of a young child. As for the reason for a continuance, Mother suggests that she lacked notice of the hearing, citing previous problems with service in the case. However, Mother points to no evidence showing that she timely asserted a lack of notice following the hearing, nor does she establish on appeal that she lacked notice. It is mere conjecture. In fact, Mother's then-attorney told the Chancery Court that Mother "knew about this trial." Mother also makes much of the fact that her then-attorney forgot to take his cell phone to the hearing. However, that alone does not justify Mother's failure to show up. All in all, Mother has offered no valid reason for why she missed the hearing. Regarding diligence, Mother missed the hearing without explanation, leaving her then-attorney to move orally for a continuance. That was not diligent on Mother's part. Finally, regarding prejudice, Mother is correct in that she lost her parental rights to the Child after being denied a continuance and the trial being held. However, to the extent this factor favors a continuance, it is outweighed by the other factors, chiefly Mother's failure to timely provide a valid reason for why she could not attend the hearing as scheduled. In view of the need to move this case forward so that the Child can achieve permanency, as well as Mother's failure to timely or adequately explain why she missed the hearing, we find that the Chancery Court's decision to deny Mother's request for a continuance had a factual basis properly supported by evidence in the record; was based on the most appropriate legal principles applicable to the decision; and was within the range of acceptable alternative dispositions. The Chancery Court did not abuse its discretion in denying Mother a continuance.

We next address whether the Chancery Court erred in finding the ground of severe child abuse against Mother. This ground allows for the termination of parental rights when the following is proven: "The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4) (West July 1, 2021 to June 30, 2022). A prior finding of severe child abuse by a juvenile court in dependency and neglect proceedings can be *res judicata* in later parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents a parent from re-litigating whether he or she committed severe child abuse. *Id.* In March 2018, the juvenile court adjudicated one of Mother's other children not subject to this appeal a victim of severe

child abuse perpetrated by Mother. In January 2022, the juvenile court adjudicated the Child a victim of severe child abuse perpetrated by Mother. Both orders are final.

Mother argues first that she did not agree to the substance of the allegations against her in the 2018 adjudicatory finding of severe child abuse, thus hers was effectively a plea for *nolo contendere*. She says that, consequently, the 2018 finding should not be used against her in this termination proceeding. Mother acknowledges that she has found no caselaw, rules, or statutes to support her argument. Second, Mother states that there is no underlying competent evidence in the record to support the January 2022 severe child abuse adjudication against her—there is only the order itself. With respect to the 2018 finding of severe child abuse, there is no legal support for Mother's contention that it cannot be held against her in this proceeding. It is a final order and *res judicata*. The same is true for the January 2022 finding of severe child abuse with respect to the Child.[9] We find, as did the Chancery Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of abandonment by failure to visit against Mother. Abandonment is found at Tenn. Code Ann. § 36-1-113(g)(1), and the relevant abandonment ground has been defined as when a parent has failed to visit the child "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption. . . ." Tenn. Code Ann. § 36-1-102(1)(A)(i) (West May 9, 2022 to June 30, 2022). The visitation must be more than token in nature. Token visitation is visitation "that under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C) (West May 9, 2022 to June 30, 2022). A parent may raise an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that her failure to visit the child was not willful, which the parent must then prove by a preponderance of the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I). The relevant period for examination is February 2, 2022, to June 1, 2022, the day before DCS filed its petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed* ("[T]he applicable four month window for determining whether child support

---

[9] Mother makes an additional argument that the January 2022 order constituted inadmissible hearsay. She notes that Mother's then-attorney objected on hearsay grounds when Usrey was asked about the circumstances leading to the Child's removal. However, the underlying exhibit 13—the January 2022 adjudicatory order—already had been admitted without objection earlier in the trial. The January 2022 order is sufficient on its own to establish this ground for termination. Were it not sufficient, the 2018 order would establish this ground, as Mother recognizes in her brief.

has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed.").

Regarding this and her remaining grounds, Mother states that "[i]t is undeniable that the uncontroverted testimony of the two DCS witnesses and uncontroverted testimony of the foster parents would establish those grounds." Mother says, however, that "[h]ad the Mother's continuance been granted for the Mother to participate and testify, her testimony in light of the inconsistencies of DCS's only witness to the grounds pleaded by DCS could have affected the result of some or all of the grounds." Perhaps, but then it was incumbent upon Mother to show up for the hearing and participate, or otherwise explain in a timely manner why she could not. As it stands, the evidence does not preponderate against the Chancery Court's findings relative to this ground. Mother's handful of visits with the Child in the relevant period were token in nature. We find, as did the Chancery Court, that the ground of abandonment by failure to visit was proven against Mother by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of abandonment by failure to support against Mother. Termination may occur under this ground when a parent has failed to support or has failed to make reasonable payments toward the support of the child "[f]or a period of four (4) consecutive months immediately preceding" the filing of a termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i) (West May 9, 2022 to June 30, 2022). As with failure to visit, an affirmative defense is available to parents if they can prove by a preponderance of the evidence that their failure to support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). We note that "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]" Tenn. Code Ann. § 36-1-102(1)(H) (West May 9, 2022 to June 30, 2022). In addition, "[t]hat the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]" Tenn. Code Ann. § 36-1-102(1)(D) (West May 9, 2022 to June 30, 2022). The relevant four-month period was February 2, 2022, to June 1, 2022. Mother never provided the Child with any money or material support over the course of this case. She also failed to establish lack of willfulness. The evidence does not preponderate against the Chancery Court's findings relative to this ground. We find, as did the Chancery Court, that the ground of abandonment by failure to support was proven against Mother by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of substantial noncompliance with the permanency plan against Mother. Termination of parental rights may occur when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37,

-27-

chapter 2, part 4[.]" Tenn. Code Ann. § 36-1-113(g)(2) (West July 1, 2021 to June 30, 2022). As reflected in the Chancery Court's findings, Mother did essentially nothing on her permanency plan. She hardly participated at all. Mother's noncompliance with her permanency plan was substantial, if not total. The evidence does not preponderate against the Chancery Court's findings relative to this ground. We find, as did the Chancery Court, that the ground of substantial noncompliance with the permanency plan was proven against Mother by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of failure to manifest an ability and willingness to assume custody against Mother. Tenn. Code Ann. § 36-1-113(g)(14) provides that: "A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" (West July 1, 2021 to June 30, 2022). Thus, there are two prongs to the ground. Regarding the first prong, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Regarding the second prong, and as relevant to this appeal, "[t]his Court has previously held that when a parent is essentially a stranger to a Child, and the Child is thriving and bonded in his or her current household, forcing the Child to begin visitation with the estranged parent is likely to cause psychological harm to the Child." *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at *12 (Tenn. Ct. App. Jan. 31, 2023), *no appl. perm. appeal filed*.

Mother did next to nothing on her case. She engaged in some token visitation and did little more than that. She never paid any child support. She would not take drug screens despite drugs being an issue in this matter. There is no hint that she can safely raise children. She has failed to manifest either an ability or willingness to assume custody of the Child. Effectively, Mother is a stranger to the Child. Meanwhile, the Child is deeply attached to her foster family, who attends to her special needs and provides her with a stable home life. To remove the Child from her present environment and place her in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the Child. The evidence does not preponderate against the Chancery Court's findings relative to either prong of this ground. We find, as did the Chancery Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

Mother's final issue is whether the Chancery Court erred in finding that termination of Mother's parental rights is in the Child's best interest. The statutory best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).

The Chancery Court found that all the best interest factors favored terminating Mother's parental rights except for factor (G). DCS concedes that factor (F), regarding a child's fear of living in the parental home, is inapplicable since the Child never lived in Mother and Legal Father's home. For their part, Foster Parents argue that factor (F) applies and weighs in favor of termination. We agree with DCS as to the inapplicability of factor (F), and review Mother's arguments on the other factors.

Mother argues with respect to factor (T) that the Child is three-years old and still at a developmental stage at which she would not necessarily incur any harm were she to go from Foster Parents' care to Mother's care. We disagree. The unrebutted testimony from trial showed that the Child, while quite young, is already strongly bonded to her foster family. We find no error in the Chancery Court's determination that factor (T) favors termination of Mother's parental rights.

Mother asserts error in the Chancery Court's determinations on other factors as well. On factor (E), Mother points to evidence that she held the Child during visits. However, given the relative paucity of Mother's visits and her overall lack of connection with the Child, that Mother sometimes held the Child is not dispositive. Regarding factors (A), (B), (D), (E), (L), and (T), Mother argues that the Chancery Court wrongly lumped Mother and Legal Father together when discussing how hard it was for DCS to communicate with the pair. Mother casts Legal Father as responsible for any hindrance in the department's communication with her, since he insisted that DCS communicate through him. Mother also mentions her speech impediment as a barrier to communication. However, there is no hint in the record that Mother was inclined to cooperate with DCS but for Legal Father's interference. Mother had her own individual responsibility to stay in touch with DCS over the custodial episode, whatever Legal Father's attitude toward the process was. She failed to stay in touch or cooperate. As for Mother's speech impediment, we note Tellez's testimony that she could still communicate with Mother despite it. Mother's excuses are unavailing.

Regarding factors (C), (J), (K), (L), (P), (Q), and (R), Mother cites a lack of proof, or an improper shifting of the burden to her. Mother says that "there is not substantive evidence to find a preponderance of the evidence, except as to the factors involving [Foster Parents'] positive relationship with Tayla. That relationship, while undisputedly positive for Tayla, does not outweigh the Mother's right to due process." However, we disagree with Mother about a lack of substantive evidence for the Chancery Court's findings. If a parent chooses to be evasive or non-cooperative with the department, as largely was the case with Mother, that parent cannot later succeed in court by benefitting from a positive inference based on the mysterious circumstances created by that parent's evasiveness. For example, if a parent thwarts DCS's efforts to investigate the inside of her residence to see if it is suitable for a child, whether by conveniently never being home or never answering the door or simply always refusing entry, the fact that it is unknown whether the residence is suitable for a child is not a point in the parent's favor for purposes of a best interest analysis—the parent brought the uncertainty about by her earlier non-cooperation. This was the case with Mother. Thus, for instance, the Chancery Court's finding that "[t]here's no proof of any healthy or safe home environment that [Legal Father and Mother] can provide" was not improper burden-shifting, but rather a reflection of Mother's stonewalling in this case. Another example is that of drug screens. Incredibly, Mother refused drug

screens, even though the Child entered state custody in part because of Mother's prenatal drug use and was adjudicated a victim of severe child abuse perpetrated by Mother. Once more though, Mother stonewalled, and now seeks to benefit in court from a lack of evidence of her drug use. The Chancery Court was not impressed with this approach, and neither are we.

Mother did next to nothing on her case. She never demonstrated that the underlying issues necessitating removal were corrected. Mother never supported the Child and seldom visited her. Mother also has been found to have perpetrated severe child abuse on the Child as well as another one of her other children not subject to this appeal. Foster Parents, by contrast, have provided the Child with material support, stability, and a bonded family life. Excepting factors (G) and (F) discussed above, the remaining factors overwhelmingly favor termination as found by the Chancery Court. We find by clear and convincing evidence, as did the Chancery Court, that termination of Mother's parental rights is in the Child's best interest.

We now turn to Legal Father's issues, beginning with whether the Chancery Court erred in finding that Legal Father's presumption of paternity was rebutted. Legal Father is not the biological father of the Child. However, Legal Father married Mother the day that the Child was born. He argues that he is therefore still entitled to the rights of a legal father. The Chancery Court found specifically that Legal Father is the Child's legal father. Under Tenn. Code Ann. § 36-1-102(29)(A)(ii), a "legal parent" includes "[a] man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court[.]" (West May 5, 2023 to June 30, 2023).[10] Nonetheless, a legal father's "presumption of paternity" may be rebutted "as described in § 36-2-304," in which case "the man shall no longer be a legal parent for purposes of this chapter and no further notice or termination of parental rights shall be required as to this person[.]" Tenn. Code Ann. § 36-1-102(29)(C) (West May 5, 2023 to June 30, 2023). Tenn. Code Ann. § 36-2-304 provides that the presumption "may be rebutted in an appropriate action" by a preponderance of the evidence. Tenn. Code Ann. § 36-2-304(b)(1), (3) (West eff. July 10, 2014). This Court has discussed the presumption of paternity and how it may be rebutted as follows:

> On appeal, the Appellant argues that he should be given residential time and specifically points to the definition of a "legal parent" contained in Tennessee Code Annotated section 36-1-102, which contains definitions applicable to adoption and termination. Specifically, as the Appellant notes,

---

[10] Foster Parents, and not DCS, alleged that Legal Father's paternity to the Child was rebutted. Thus, on this issue, we look to the statutes as they read when Foster Parents filed their amended petition on May 19, 2023.

a "legal parent" thereunder includes "[a] man who is or has been married to the biological mother of the child if the child was born during the marriage." Tenn. Code Ann. § 36-1-102(29). According to the Appellant, "[i]f the mother remarries and wanted to have her new husband adopt the child, then she would have to terminate the rights of the Appellant. She would have to do so because he is recognized as the legal father under Tennessee law."

There does not appear to be any dispute that the child at issue was born during the marriage of the parties, and we do not question under the law that such a fact made the Appellant the *presumptive* father. *See* Tenn. Code Ann. § 36-2-304 (noting that a man is rebuttably presumed to be the father of a child if the man and child's mother "are married or have been married to each other and the child is born during the marriage"). Presumptions, however, by their very nature are not absolute as to their subject matter, and here, we agree with the trial court that the Appellant's presumption of parentage was sufficiently overcome by the very DNA testing he requested be performed. Moreover, the Appellant conceded he was not the biological father in his "Rule 60" motion. As for his argument that he carries a parental status such that he would even be required to be involved in termination proceedings should a future spouse of the Appellee wish to adopt the child, we note that the same statutory section relied upon by the Appellant for his position about him being the "legal parent" belies the point. Indeed, the Code provides that, where as here, "the presumption of paternity . . . is rebutted . . . the man shall no longer be a legal parent for purposes of this chapter and no further notice or termination of parental rights shall be required as to this person." Tenn. Code Ann. § 36-1-102(29)(C).

*Audirsch v. Audirsch*, No. M2020-00279-COA-R3-CV, 2021 WL 225683, at *2 (Tenn. Ct. App. Jan. 22, 2021), *no appl. perm. appeal filed*.

Legal Father's presumption of paternity was just that—a presumption. It was capable of being rebutted. Legal Father's only source of connection to the Child is the fact that he married Mother on the day that the Child was born. DNA testing has since shown that he is not the Child's biological father. Given that, we find that Legal Father's presumption of paternity to the Child has been successfully rebutted. We find, as did the Chancery Court, that Legal Father's presumption of paternity to the Child was successfully rebutted.

In the interest of completeness, we next address whether the Chancery Court erred in finding, in the alternative, several grounds including the ground of abandonment by failure to visit against Legal Father. The relevant four-month period for Legal Father was

February 2, 2022, to June 1, 2022.[11]  Legal Father's fewer than two individual day stints in jail do not alter the four-month period.  *See* Tenn. Code Ann. § 36-1-102(1)(J) ("For purposes of this subdivision (1), a period of incarceration lasting less than seven (7) consecutive days must be counted as days of nonincarceration[.]") (West May 9, 2022 to June 30, 2022).[12]  Legal Father states that he "visited the child five times and was prevented from visiting with her several more times due to cancellation of the visits by the Department."  This was five out of thirty visits overall.  During the relevant four-month period, Legal Father visited the Child three out of ten scheduled times.  He was always late.  According to the trial testimony, he mainly played on his phone during the visits.  This amounted to token visitation.  Legal Father's assertion that he was "prevented" from seeing the Child more often is unsupported by the record.  Legal Father knew that he could request help with transportation if he needed it, provided he gave DCS sufficient advance notice.  He did not.  Contrary to Legal Father's brief, any argument that his failure to visit was not willful constitutes an affirmative defense that was incumbent upon him to raise and prove, *see* Tenn. Code Ann. § 36-1-102(1)(I), which he failed to do.  Legal Father's excuses for his failure to visit the Child in more than a token way are unavailing.  The evidence does not preponderate against the Chancery Court's findings relative to this ground.  We find, as did the Chancery Court, that the ground of abandonment by failure to visit was proven against Legal Father by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of abandonment by failure to support against Legal Father.  The relevant four-month period for Legal Father was February 2, 2022, to June 1, 2022.  Legal Father never paid any child support whatsoever.  Undaunted, Legal Father argues that DCS failed to show that his failure to pay was willful.  However, as with failure to visit, a lack of willfulness for failure to support is an affirmative defense Legal Father could have raised and attempted to prove by a preponderance of the evidence.  *See* Tenn. Code Ann. § 36-1-102(1)(I).  He failed to do so.  The evidence does not preponderate against the Chancery Court's findings relative to this ground.  We find, as did the Chancery Court, that the ground of abandonment by failure to support was proven against Legal Father by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of substantial noncompliance with the permanency plan against Legal Father.  On this ground, Legal Father argues that the requirements of his permanency plan were "unreasonable."  For instance, Legal Father argues that requiring him to undergo drug screens was

---

[11] Where the same grounds for termination are reviewed for Legal Father as they were for Mother, we apply the same versions of the statutes.

[12] Nevertheless, the Chancery Court made alternative findings for both the incarcerated and non-incarcerated versions of the ground of failure to visit as to Legal Father.  In view of the meagerness and low quality of Legal Father's visits throughout the entire custodial episode, the difference in timeframes is not outcome-determinative.

unreasonable when there was no suggestion that he used drugs over the course of this case. However, given that the juvenile court found the Child to be a victim of severe child abuse due to Mother's prenatal drug use, and with drug abuse therefore being a factor in this case, it was not unreasonable for the department to ask Legal Father to take drug screens. It was unreasonable, on the other hand, for Legal Father to unilaterally decide that he was not going to take drug screens. Even setting aside this particular responsibility under the plan, Legal Father did practically nothing else either. Legal Father did not show DCS the inside of his residence, the RV, so DCS could determine whether it was fit for the Child. That DCS was unable to determine the suitability of Legal Father's home because he would not show it to them is not a point in Legal Father's favor. In addition, Legal Father's visits were few and token in nature. He never completed any of the assessments he was required to take. Legal Father even said outright that he was not going to cooperate with the permanency plan. The evidence does not preponderate against the Chancery Court's findings relative to this ground. We find, as did the Chancery Court, that the ground of substantial noncompliance with the permanency plan was proven against Legal Father by clear and convincing evidence.

We next address whether the Chancery Court erred in finding the ground of failure to manifest an ability and willingness to assume custody against Legal Father. Father asserts that he has shown the ability to parent the Child by securing work, income, and housing. However, Legal Father failed to show proof of a legal means of income or create a budget. Despite purporting to work, he never provided the Child with any support. He completed no assessments. In addition, he never showed DCS the inside of his residence, the RV. Legal Father has failed to manifest an ability to assume custody of the Child. Legal Father argues further that he has shown a willingness to assume custody based on his visits to the Child and by disputing the termination of his parental rights. First, Legal Father's meager visits were few and spent mostly with him looking at his phone. Second, his mere act of disputing the termination proceeding pales in comparison to his failure to do practically anything in the case, including his paying no child support whatsoever. Legal Father has failed to manifest a willingness to assume custody of the Child.

Regarding the second prong of the ground, the effect of placing the Child in Legal Father's custody would be to uproot her from her known, stable home and put her with a stranger. Given the Child's attachment to her foster family and her special needs, such a move would pose a risk of substantial harm to the physical or psychological welfare of the Child. The evidence does not preponderate against the Chancery Court's findings relative to either prong of this ground. We find, as did the Chancery Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Legal Father by clear and convincing evidence.

The final issue we address is whether the Chancery Court erred in finding that termination of Legal Father's parental rights is in the Child's best interest. Legal Father states that the Chancery Court erred in finding that termination of his parental rights is in the Child's best interest. He says that "several of the factors are impossible to determine given the limited time Respondent has received with the child." We disagree. Legal Father did essentially nothing in this case except attend a few token visits. If he had limited time with the Child, it was his choice. He provided no child support whatsoever. He failed to cooperate with services. On the contrary, he bluntly rejected services. He refused drug screens. He never completed assessments. He would not even show DCS the inside of his RV. Meanwhile, the Child is in a stable, loving home. She is having her special needs attended to by Foster Parents. There is no hint that Legal Father is able or willing to tend to the Child and her special needs. Aside from factors (G) and (F), which are inapplicable, the remaining factors overwhelmingly favor termination of Legal Father's parental rights to the Child, as found by the Chancery Court. We find by clear and convincing evidence, as did the Chancery Court, that termination of Legal Father's parental rights is in the Child's best interest.

### Conclusion

The judgment of the Chancery Court is affirmed, and this cause is remanded to the Chancery Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Jesse R. and Tamara R., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE